**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INBANK, | |
| PLAINTIFF, | |
| V. | Case No. |
| ELBERT ELMORE, VIRGINIA BROWNING, NORMAN REIHER and ROBERT ROMERO, | **JURY DEMANDED** |
| DEFENDANTS. | |

<u>**COMPLAINT**</u>

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for InBank ("FDIC-R"), by its counsel, Pugh, Jones & Johnson, P.C., complains against Defendants, Elbert Elmore, Virginia Browning, Norman Reiher and Robert Romero, as follows:

**I.      INTRODUCTION**

1.      FDIC-R brings this case in its capacity as Receiver for InBank ("InBank" or "Bank").  Defendants are three former Directors and Officers of InBank and one former Director of InBank, each of whom approved certain high-risk commercial real estate ("CRE") and acquisition, development and construction ("ADC") loans in breach of the duties of care they owed the Bank.  By this action, FDIC-R seeks to recover damages in excess of $6.8 million caused by Defendants' negligence, gross negligence and breaches of fiduciary duties.

2.      Between November 2005 and October 2008, Defendants, in their capacities as members of the Loan Committee of InBank's Board of Directors ("Loan Committee"), approved and/or increased at least 15 CRE and ADC loans without obtaining information sufficient to

make an informed and independent business decision about the prudence of each loan. Despite Defendants' knowledge of the significant deterioration in the market into which InBank was lending, Defendants approved the loans even though it was plainly apparent that the loans had not undergone adequate scrutiny.

3.     All of the members of InBank's Board of Directors ("Board") were also members of the Loan Committee. The overlapping composition of InBank's Board and Loan Committee stifled the Board's exercise of independent judgment and critical analysis of the referenced loans, as did the fact that InBank's five-member Board was almost exclusively comprised of InBank insiders. During all relevant times, InBank's Board members were: Defendant Elbert Elmore ("Elmore"), who was the Chairman of the Board and InBank's Chief Executive Officer ("CEO"); Cynthia Elmore-Grazian ("Grazian"), who was Vice-Chairman of the Board, InBank's Senior Vice President of Lending and InBank's CEO following Elmore's resignation; Bank President Andrew Tinberg ("Tinberg"); Defendant Virginia Browning ("Browning"), Senior Vice President of InBank; and Senior Vice President Thomas DeRobertis ("DeRobertis"). The only non-officer Board member was Defendant Norman Reiher ("Reiher").[1] Decisions presented to the Board and its Loan Committee typically were not subject to strong outside challenge.

4.     As a result of Defendants' failure to: (i) properly evaluate CRE and ADC loans they approved; (ii) ensure that the loans pertained to economically viable projects, managed by creditworthy borrowers who were backed by guarantors with sufficient financial wherewithal to support the loans, particularly in view of the declining real estate market into which the Bank was lending; (iii) ensure loans were secured by sufficient collateral; (iv) ensure that borrowers made equity contributions; and (v) monitor the collateral securing CRE loans and monitor the

---

[1] Subsequent to InBank's failure, Grazian, Tinberg and DeRobertis each filed bankruptcy and listed FDIC-R as a creditor. Their debts were discharged

progress of construction projects underlying ADC loans, InBank suffered significant and unnecessary injury and damage and the quality of its loan portfolio steadily deteriorated.

5.      On September 4, 2009, the Illinois Department of Financial and Professional Regulation closed InBank and appointed the FDIC as Receiver.  At failure, InBank's assets totaled $211.4 million, far less than its liabilities.  The estimated loss to the FDIC Deposit Insurance Fund that would result from InBank's collapse is $66 million.

## II.      PARTIES

**A.      Plaintiff**

6.      The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  12 U.S.C. § 1811, *et seq.*  The FDIC is an instrumentality of the United States of America charged with, among other things, managing the orderly liquidation of failed financial institutions.  Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC as Receiver succeeds to all of the rights, powers and privileges of such insured institutions as well as the rights of any stockholder, member, account holder, depositor, officer or director of the institution with respect to the institution and the assets of the institution.

**B.      Defendants**

7.      Defendant Elmore was one of the Bank's founders.  From June 25, 1970 to March 12, 2008, Elmore was CEO of InBank.  From the Bank's founding until July 30, 2009, Elmore served as a member of the Board of InBank.  During all times relevant hereto, Elmore also served as a member of InBank's Loan Committee, the committee with ultimate authority to approve the loans identified in the chart in Paragraph 39.  In his capacity as a member of InBank's Loan Committee, Elmore approved all the loans in the chart.

8.      Defendant Browning was a Senior Vice President of InBank from June 25, 1970 until March 25, 2009.  Browning served as a member of InBank's Board from April 20, 2005 until March 25, 2009.  During all times relevant hereto, Browning also served as a member of the Bank's Loan Committee.  In her capacity as a member of InBank's Loan Committee, Browning approved twelve of the loans in the chart in Paragraph 39.

9.      Defendant Reiher was a founder of the Bank and served as a member of InBank's Board throughout the Bank's existence.  During all times relevant hereto, Reiher also served as a member of InBank's Loan Committee.  In his capacity as a member of InBank's Loan Committee, Reiher approved fourteen of the loans in the chart in Paragraph 39.

10.     Defendant Robert Romero ("Romero") was InBank's Vice President of Lending and Senior Lending Officer from April 19, 2005 until September 4, 2009.  During all times relevant hereto, Romero also served as a member of InBank's Loan Committee.  In his capacity as a member of InBank's Loan Committee, Romero approved eleven of the loans in the chart in Paragraph 39.

### III.      JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1345.

12.     The Court has personal jurisdiction over Defendants pursuant to 735 ILCS §§ 5/2-209(a)(1) and (2).

13.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## IV.    FACTUAL BACKGROUND

14.      InBank, a wholly-owned subsidiary of ISB Financial Corporation ("ISB"), was a state-chartered, nonmember bank insured by the FDIC.  It opened for business on June 25, 1970 under the name Interstate Bank of Oak Forest ("Interstate").  Its main office was located in Oak Forest, Illinois, and it had branch offices in Chicago, IL and Tinley Park, IL.  In 2008, Interstate changed its name to InBank.  In October 2009, shortly after InBank's September 2009 failure, ISB filed bankruptcy.

15.      Prior to 2004, InBank's lending activities were focused on real estate reconstruction, development and renovation in its primary trade area of Oak Forest, IL. Thereafter, the Bank substantially expanded its lending activities and began engaging in significantly more CRE and ADC lending in Chicago and the greater Chicagoland area.

16.      In June 2005, InBank had approximately $41 million in construction and land development loans.  In June 2006, just one year later, InBank reported construction and land development loans in excess of $61 million.  For quarters ending September and December 2006 and March 2007, InBank reported construction and land development loans of $66 million, $64 million and $65 million, respectively.  Thereafter and through September 2008 (years when the Bank's total assets fluctuated between $194.4 and $213 million), InBank consistently reported well over $50 million per quarter in construction and land development loans.

17.      InBank increased and/or maintained its concentration in construction and land development loans even after it experienced a substantial spike in past due construction loans and began experiencing ever-increasing nonaccruals.  For example, in June 2005, InBank reported $302,000 in past due construction loans.  As of March 2006, InBank's past due construction loans exceeded $2.7 million and by December 2006, had risen to $3.95 million.

Thereafter, InBank's past due construction loans reached new highs. For quarters ending March and June 2007, InBank's past due construction loans jumped to $8.69 and $9.45 million, respectively, and from September 2007 through September 2008, nonaccruals on InBank construction loans routinely reached or exceeded $2 million, hitting $3.15 million by December 2008.

## A.    General Deficiencies in InBank's CRE and ADC Lending

18.    CRE and ADC lending is a specialized field with unique risks that require thorough understanding and close management. CRE and ADC loans are highly sensitive to market fluctuations. Consequently, the ability to identify, measure, monitor and control risk through effective underwriting policies, administrative systems, and internal controls is crucial to sound CRE and ADC lending. InBank personnel, including Defendants, lacked and/or failed to demonstrate such ability and, as a result, failed to effectively control the risks associated with the Bank's CRE and ADC lending activities.

19.    At all times relevant hereto, Defendants failed to implement procedures that would have lessened the risks of the Bank's CRE and ADC lending practices. Defendants routinely relied on miscalculated loan to value ("LTV") ratios, ignored InBank's loan policy limits on LTV ratios, relied on inadequate appraisals, inappropriately funded and recharged interest reserves and ignored InBank's loan policy limits on loan concentrations.

20.    Defendants approved CRE and ADC loans without analyzing the economic viability of the underlying properties and/or construction projects or thoroughly evaluating the creditworthiness of its borrowers and guarantors. For example, Defendants regularly failed to analyze all of the loans its borrowers and guarantors had with InBank and the loans they had with other lenders.

21.     Defendants also failed to properly monitor the Bank's CRE and ADC loan portfolio, the poor quality of which significantly contributed to the decline in the Bank's financial condition and its ultimate demise.

22.     Further, even after the decline in the real estate market became widely known, Defendants continued to approve new CRE and ADC loans and renew existing troubled loans without conducting necessary financial analysis of the proposed credits, borrowers or guarantors, rather than curtailing such lending, tightening the Bank's underwriting standards, and preserving capital to absorb losses when poorly underwritten CRE or ADC loans went bad.

**B.      Loan Committee's Knowledge of Deficiencies
        in InBank's CRE and ADC Lending Practices**

23.     Based on an examination of InBank's records as of December 2004, Bank examiners warned Defendants of multiple underwriting deficiencies that were adversely affecting InBank's loan portfolio, including: (i) improper and understated LTVs, (ii) the lack of adequate financial documentation for borrowers and/or guarantors; (iii) insufficient cash flow analyses; (iv) failures to adequately document the repayment capacity of borrowers and/or guarantors; and (v) far too frequent use of 30-year amortization schedules on income producing properties.

24.     Examiners also warned Defendants of significant concentrations in the Bank's loan portfolio which, in the event of a downturn in the sector in which the concentrations existed, exposed the Bank to unnecessary and increased risks.  Specifically, examiners noted that CRE loans represented 627% of InBank's Tier 1 Capital and construction and development loans represented 300% of its Tier 1 Capital.

25.     Defendants ignored the warnings of examiners and continued in the following years to make loans totaling more than $21 million that suffered from the underwriting deficiencies identified in the examination report.

26.     Based on an examination of InBank's records as of the close of 2006, examiners warned the Board that the increase in the quantity and severity of the Bank's classified assets was a concern, noting that the Bank had $4.1 million in assets classified as Substandard and $1.84 million in assets classified as Loss.  Examiners directed the Bank to charge off all assets classified as Loss.

27.     Examiners also warned of continuing deficiencies in the Bank's underwriting practices, specifically noting that the Bank needed to improve its cash flow analyses and more timely review financial statements as well as properly provision allowances for loan and lease losses ("ALLL").  Examiners noted that a loan loss provision of approximately $1.64 million was needed to bring the ALLL to an acceptable level and that the provisioning had to be done prior to the end of 2006.

28.     Examiners noted that the percentage of InBank's past due and nonaccrual loans exceeded that of the Bank's peers.  They also noted that as of September 30, 2006, InBank had a concentration of 611% of Tier 1 Capital in CRE loans and a concentration of 516% of Tier 1 Capital in residential construction, development and renovation loans.

29.     Based on an examination of InBank's records as of the close of 2007, examiners deemed InBank's condition less than satisfactory.  Among other things, examiners noted a significant increase in the Bank's adversely classified loan assets, the Bank's failure to appropriately monitor and control developing risks, its failure to properly adjust credit grades, and its reliance on appraisals that did not include construction budget reviews or cost-based

valuations. Examiners concluded that the deficiencies in the Bank's loan portfolio were a direct result of its ongoing weak underwriting and the failure to improve the lax supervision of its lending function, particularly with respect to CRE loans.

30.     In their capacity as members of InBank's Loan Committee, Defendants approved the 15 loans identified in the chart in Paragraph 39 and further described in Paragraphs 39-138 after repeatedly being warned about numerous underwriting, administrative and operational deficiencies in the Bank's CRE and ADC lending practices.

31.     Defendants approved the 15 CRE and ADC loans described in Paragraphs 39-138 when they knew or should have known the loans required a high degree of scrutiny, because the Bank's loan origination function (which generated "sales" of new loans) was not segregated from its loan administration function (which performed credit analysis and monitoring). At a minimum, this significant internal control deficiency should have caused Defendants to apply a more stringent level of review to the loans before approving them to ensure compliance with the Bank's loan policy. Instead, in disregard of generally accepted principles of safety and soundness, Defendants approved the loans despite patent loan policy violations and notwithstanding imprudent loan terms that rendered repayment speculative, and in some cases, highly unlikely.

32.     Defendants knew or should have known the lack of proper controls was particularly problematic because Grazian, who was the principal originator of the CRE and ADC loans described in Paragraphs 39-138, had significant influence and control over Bank operations. Grazian was Senior Vice President of Lending and later CEO, a member of the

Loan Committee, Vice Chairman of InBank's Board, and the daughter of Bank Chairman Elmore.

33.     Further, Defendants knew Grazian ignored conditions the Loan Committee placed on its approval of certain loans.  For example, in connection with a loan the Loan Committee approved on the condition that a property appraisal establish an "as completed" value of $1,800,000 for the project, Grazian told Defendant Romero and the loan administrator who advised her that the "as completed" value came in at only $1,420,000, to close the loan "or else. . . . . ."  Romero and the loan administrator complied.  The remaining Defendants either knew of, or later became aware of, Grazian's actions, because the deficient appraised value was included in a subsequent loan presentation pursuant to which the borrower sought an increase in the amount of the loan.  Defendants ratified Grazian's unapproved conduct by approving the requested increase.

34.     In their capacity as members of InBank's Loan Committee, Defendants approved the 15 loans described in Paragraphs 39-138 when they knew or should have known the Bank's underwriting standards were too lenient, particularly in view of the declining real estate market into which the Bank was lending.

35.     Defendants approved the 15 loans described in Paragraphs 39-138 when they knew or should have known that in connection with CRE and ADC loans, a lender must monitor the properties and/or progress of construction projects to which the loans relate and regarding construction projects, determine whether the percentage of funds disbursed is consistent with the percentage of the project's completion.  When the percentages are not consistent, an out-of-balance condition occurs, and the lender must either lend additional funds to cure the condition

or require borrowers to place additional funds into the project. Although Defendants knew InBank's tracking procedures were woefully inadequate, Defendants approved renewals of, and increases to, the 15 CRE and ADC loans without properly analyzing whether the underlying projects were performing as originally projected.

36.     InBank's loan policy, as established by the Board, appropriately defined loans lacking a defined repayment plan and loans lacking financial information sufficient to demonstrate a borrower's ability to repay the loan as undesirable. Nonetheless, Defendants approved the 15 loans described in Paragraphs 39-138 without requiring defined repayment plans and/or financial information sufficient to establish the borrower's repayment capacity.

37.     InBank's loan policy, as established by the Board, limited concentrations to 375% of Tier 1 Capital and limited the concentration of particular types of loans, such as residential construction loans, to 100% of Tier 1 Capital. Nonetheless, Defendants approved the 15 loans described in Paragraphs 39-138 even though they knew the loans exceeded the Banks' concentration limits.

**C.     Defendants' Imprudent Approval of Certain Loans**

38.     Pursuant to the Bank's Loan Policy, all loans exceeding the lending limits of individual officers (*i.e.*, loans above $150,000) had to be reviewed by InBank's Loan Committee, which was comprised of the entire Board, the Bank president, the senior lending officer and loan officers.

39.     As members of the Loan Committee, Defendants were negligent, grossly negligent and breached their fiduciary duties to the Bank by approving at least the following 15

loans, which were originated for approximately $22 million and to date have caused losses of approximately $6.8 million.

| Borrower | Loan Amount | Approval Date | Damage Estimates | Approvals | | | |
|---|---|---|---|---|---|---|---|
| | | | | Defendant Elmore | Defendant Browning | Defendant Reiher | Defendant Romero |
| Borrower K[2] | $2,500,000 | 11/30/05 | $2,468,822 | X | X | X | |
| Borrower K | $500,000 | 4/19/06 | | X | | X | X |
| Borrower K | $250,000 | 10/4/06 | | X | X | X | X |
| Borrower K | $750,000 | 1/24/07 | | X | X | X | X |
| Cortland | $2,905,000 | 4/5/06 | $842,932 | X | X | X | X |
| Cortland | $330,000 | 7/18/07 | | X | X | X | X |
| MBCA | $2,475,000 | 5/24/06 | $1,399,039 | X | X | X | X |
| MBCA | $665,000 | 7/6/07 | | X | X | X | X |
| Borrower V | $3,565,000 | 11/8/06 | $804,481 | X | | X | |
| Borrower V | $500,000 | 2/27/08 | | X | X | | X |
| Borrower V | $200,000 | 7/7/08 | | X | X | X | X |
| Borrower V | $7,000 est. | 10/1/08 | | X | | X | |
| Borrower A | $1,200,000 | 9/5/07 | $553,000 | X | X | X | X |
| Borrower A | $227,000 | 3/27/08 | | X | X | X | |
| ICON | $5,500,000 | 4/9/08 | $788,692 | X | X | X | X |
| **TOTAL** | **$21,574,000** | | **$6,856,966** | | | | |

---

[2] To protect the privacy of individual borrowers and guarantors, their names have been withheld. Their names will be provided after an appropriate protective order is in place.

40.     The above-identified loans arose from six lending relationships with the following borrowers:  Borrower K; Cortland Tower, LLC ("Cortland"); MBCA, Inc. ("MBCA"); Borrower V; Borrower A; and ICON Partners, LLC ("ICON").  Defendants failed to consider and adequately assess the risks attendant to approving the above loans to these borrowers. Defendants approved the loans at a time when the Bank's rapidly growing concentration in CRE and ADC loans exceeded Bank policy, regulatory guidance and accepted principles of safety and soundness.  At the time of each approval, Defendants knew or should have known of InBank's underwriting deficiencies and lack of adequate controls.  At the time of the approvals, Defendants were aware of the deteriorating market into which InBank was lending.  As demonstrated below, had Defendants, in their capacity as members of InBank's Loan Committee and as Directors and/or Officers of InBank, made informed and independent credit decisions, they would not have approved the foregoing loans.

## Loans to Borrower K

41.     On November 30, 2005, Grazian presented to the Loan Committee Borrower K's request for a $2,500,000 interest-only, working capital line of credit ("LOC"), designating the requested LOC a grade "A" credit risk.  The grade "A" rating  meant the proposed credit was a:

> well-structured credit relationship with an established borrower.  An established borrower is defined as a borrower with a good credit history of not less than 5 years in the borrowing and paying of similar types of loans as that set forth presently before the lending committee.

42.     The purpose of the requested LOC was to pay off Borrower K's prior InBank loans and secure a source of working capital for Borrower K's various real estate investments.

43.     The loan presentation stated that the LOC would have a twelve-month term and would be secured by second mortgages on multiple properties.  It stated that based on a three-year average, Borrower K's debt to income ratio, including the requested LOC, would be 48%,

which represents a high level of debt. The loan presentation further stated as of November 30, 2005, InBank's concentration in residential loans was 168% of Tier 1 Capital, which exceeded Bank policy limits.

44.     Glaringly absent from the presentation was a defined repayment plan and/or financial information and analysis sufficient to demonstrate Borrower K's ability to repay the LOC, which violated the Bank's loan policy.

45.     Defendants Elmore, Reiher, Browning and other members of the Loan Committee approved the requested LOC ("Borrower K's LOC") on the day the request was presented, conditioning their approval on an appraisal by InBank and the pay off of Borrower K's debt on certain other properties. Per Bank policy, appraisals were to be obtained from certified or licensed appraisers.

46.     Five months later, on April 19, 2006, Grazian presented a request to the Loan Committee for a $500,000 increase in Borrower K's LOC. Rather than prepare a new loan presentation with updated financial information, Grazian used her November 2005 loan presentation, simply inserting a new section entitled "Resubmission Dated April 19, 2006" at the end of the presentation. Among other things, the insert indicated that $2,002,000 had been funded, Borrower K's only outstanding line of credit was this LOC, and the requested increase would be secured by additional collateral. Like the initial presentation, the April 2006 insert failed to define a repayment plan or provide any financial analysis of Borrower K's ability to repay the LOC, which violated Bank policy. Nonetheless, Grazian did not alter her prior grade "A" credit risk rating.

47.     Defendants Elmore, Reiher, Romero and other members of the Loan Committee approved the request on April 19, 2006, thereby increasing Borrower K's LOC to $3,000,000.

48.     Approximately six months later, on October 4, 2006, Grazian presented a request to the Loan Committee for another increase in Borrower K's LOC.  The request was for an additional $250,000.  The request also sought approval of the release of all but three pieces of collateral.  With respect to the remaining collateral, InBank would have a first mortgage on one parcel and second mortgages on the other two parcels.

49.     Grazian's October 2006 loan presentation reflected a reduction in Borrower K's credit scores, which likely diminished Borrower K's repayment capacity, and only showed Borrower K's income through 2004, which was stale and inadequate.  It stated that the LOC's LTV would be 81% if based on the value of all of the collateral and would be 63% if based on the value of Borrower K's net equity in the collateral.  It also stated that as of June 30, 2006, InBank had a concentration of 255% of Tier 1 Capital in residential loans, which violated Bank policy.  In further violation of Bank policy, the presentation failed to define a repayment plan or demonstrate Borrower K's ability to repay the LOC.  Grazian designated the requested increase a grade "A" credit risk.

50.     Despite the readily apparent policy violations, Defendants Elmore, Reiher, Browning, Romero and other members of the Loan Committee approved the request, thereby increasing Borrower K's LOC to $3,250,000.

51.     Three months later, on January 24, 2007, InBank's Loan Committee considered a request for an additional $750,000 for Borrower K, which would increase Borrower K's LOC to $4,000,000.

52.     As set forth in the January 24, 2007 loan presentation, the LOC had a current LTV of 81%, the Bank did not have updated personal financial statements or 2005 tax returns for Borrower K, and although the Bank would obtain additional real property collateral, it would

only have second mortgages on that collateral. In violation of Bank policy, the presentation failed to define a repayment plan or demonstrate Borrower K's ability to repay the LOC.

53.　　Defendants Elmore, Reiher, Browning, Romero and other members of the Loan Committee approved the $750,000 increase in Borrower K's LOC on the day the requested increase was presented.

54.　　Approximately one year later, on January 9, 2008 – after Borrower K's $4,000,000 LOC matured – Grazian presented a request to the Loan Committee for a twelve-month extension of Borrower K's LOC, the outstanding balance of which was then $3,999,154. The primary source of repayment was identified as Borrower K's income. The secondary source was identified as rental income or proceeds of property sales. Grazian designated the extension request a grade "A" credit risk.

55.　　Borrower K's 2007 adjusted gross income of $450,000 was more than 50% less than Borrower K's 2006 adjusted gross income, which information was or should have been available to Defendants and may have adversely impacted Borrower K's repayment capacity.

56.　　Notwithstanding this information, Defendants Elmore, Reiher, Browning, Romero and other members of the Loan Committee approved the January 9, 2008 extension request the day it was presented.

57.　　Borrower K's LOC subsequently went into default and InBank charged off more than 98% of the original principal balance.

58.　　Defendants' approval of Borrower K's LOC violated InBank's loan policy and generally accepted standards of prudent lending in various respects including the following:

(i)　　The junior mortgages securing the LOC constituted inadequate collateral and a speculative source of repayment;

(ii)     Approval of the LOC was conditioned on an InBank appraisal, which violated the Bank's loan policy requirement that the Bank obtain an appraisal from a certified or licensed appraiser;

(iii)    As a result of the October 4, 2006 loan approval, the LTV on Borrower K's LOC exceeded the Bank's policy limits and supervisory guidelines, and the Loan Committee had insufficient information on January 24, 2007 to determine whether the LTV would continue to exceed policy and supervisory limits;

(iv)     Defendants placed undue reliance on prior experience with Borrower K;

(v)      Defendants were aware or should have been aware of the fact that the loan presentations did not fully and accurately reflect Borrower K's financial situation and did not note loan policy exceptions;

(vi)     Defendants relied on outdated financial information;

(vii)    Defendants relied on inaccurate risk ratings that were not consistent with the Bank's loan policy;

(viii)   Defendants granted multiple extensions and granted extensions in excess of the three-month increment set forth in the Bank's loan policy;

(ix)     On November 30, 2005 and October 4, 2006, Defendants approved Borrower K's loan requests even though they knew the Bank had already exceeded the concentration limits in its loan policy; and

(x)      Defendants failed to require adherence to existing loan terms and extended Borrower K's LOC after it matured.

59.     The deficient underwriting, inconsistent and inadequate information, inaccurate risk ratings, loan policy violations, lack of thorough credit analysis, multiple and lengthy

extensions and other deficiencies in Borrower K's Loans were disclosed in the loan packages provided to Defendants. Defendants knew or should have known that the sources of repayment of Borrower K's LOC were inadequate and vulnerable to the deteriorating housing market into which InBank was lending. Thus, Defendants knew or should have known not to approve, increase or extend Borrower K's LOC.

60. Due to the actions and inactions of Defendants and their poor credit judgment relative to Borrower K's LOC, InBank and FDIC-R incurred damages of at least $2,468,822.

**Cortland Loans**

61. In or about May 2006, Defendants approved a $2,905,000 interest-only loan to Cortland, which Grazian had presented to the Loan Committee for approval ("Cortland Loan"). The loan was for a sixteen-month term and was personally guaranteed by Guarantor AK and Guarantor JC. For 2003 and 2004, Guarantor AK's adjusted gross income averaged about $78,000. For 2003 and 2004, Guarantor JC's adjusted gross income averaged about $12,000.

62. The purpose of the Cortland Loan was to fund the construction and development of a mixed-use building including eight residential units on Cortland Avenue, Chicago, IL ("Cortland Property"), pay off the original acquisition loan that InBank funded, and fund an interest reserve.

63. Repayment of the Cortland Loans was to be through the interest reserve and an escrow account funded with Guarantor AK's share of proceeds from the future sale of another piece of real estate.

64. Per a May 3, 2006 appraisal (which failed to include a cost-based valuation, evaluate the sufficiency of the construction budget for the Cortland Property or assess the likelihood of demand for the project), the gross retail value of the Cortland Property was

$4,815,000.  Its discounted value was $3,475,000, which resulted in an 83.5% LTV.  The LTV exceeded Bank policy and supervisory guidelines.

65.     On or about July 18, 2007, Defendants approved a $330,000 increase in the Cortland Loan, which was requested to cover alleged increases in construction costs.  As a result of this increase, the principal balance of the Cortland Loan rose to $3,235,000.  On information and belief based on a review of InBank's loan records, Defendants failed to require any additional collateral security, an updated appraisal or current financial information from Cortland or the guarantors when they approved this increase.  Based on the $3,475,000 discounted gross retail value set forth in the 2006 appraisal, the LTV of the increased loan was 93%, which violated Bank policy and supervisory guidelines.

66.     Per an April 29, 2008 appraisal in the Bank's records, which was made available to Defendants, the gross retail value of the Cortland Property dropped to $4,337,000, *i.e.*, $478,000 less than the gross retail value set forth in the 2006 appraisal.

67.     Shortly thereafter, between June 2008 and October 2008, two units in the Cortland Property were sold to relatives of Guarantor AK for amounts less than the units' appraised value.  InBank financed the purchases, and Guarantor AK and Guarantor JC personally guaranteed the buyers' loans.  Proceeds from the sales were used to pay down the Cortland Loan.

68.     Because the above-referenced buyers were not creditworthy, their loans quickly became delinquent.  Per Guarantor AK's April 20, 2008 personal financial statement, which was made available to Defendants, Guarantor AK did not have substantial liquid assets and was highly leveraged.  Guarantor JC's November 19, 2007 personal financial statement, which was made available to Defendants, showed Guarantor JC had limited liquid assets and that

- 19 -

Guarantor JC was highly leveraged. Thus, as Defendants knew or should have known, the guarantees failed to provide any material financial support to the purchase loans InBank funded.

69.     Notwithstanding the foregoing, on December 17, 2008, Defendants Elmore, Browning, Reiher, Romero and other members of the Loan Committee approved a six-month extension of the Cortland Loans, rather than seeking a workout. In doing so, they also relieved Cortland of its obligation to make monthly loan payments, expressly providing that principal and interest would be due at maturity.

70.     In violation of Bank policy, Defendants failed to charge Cortland a fee in connection with the above extension.

71.     When Defendants approved the December 2008 extension request, they knew that as of September 30, 2008, InBank had a concentration of 185% of Tier 1 Capital in residential construction mortgages, which violated Bank policy. In Chicago, it had a concentration of 458% of Tier 1 Capital.

72.     During and after 2008, the Cortland Loans were consistently troubled, and the Bank partially charged them off.

73.     Defendants' approval of the Cortland Loans violated InBank's loan policy and generally accepted standards of prudent lending in various respects including the following:

(i)     Based on the 2006 discounted value of the Cortland Property, the LTV of the $2,905,000 loan exceeded Bank policy and supervisory guidelines;

(ii)    Based on the 2006 discounted value of the Cortland Property, the LTV of the $3,235,000 loan exceeded Bank policy and supervisory guidelines;

(iii)   The Cortland Property was not properly appraised;

(iv)    There was no cash flow analyses of either Cortland or the guarantors and no evidence of Cortland's or the guarantors' ability to repay the loan;

(v)    Defendants granted extensions in excess of the three-month increment set forth in the Bank's loan policy;

(vi)    Defendants did not adhere to the loan policy requirement that they charge a fee for each extension;

(vii)    To artificially reduce the loan balance, InBank funded loans to non-creditworthy purchasers who subsequently defaulted; under the Bank's loan policy, the buyers' purchase loans were plainly undesirable;

(viii)    Defendants authorized Cortland to pay principal and interest at maturity, which unreasonably increased the Bank's risks and imprudently delayed the Bank's recognition of loss; and

(ix)    The Cortland Loans exceeded the Bank's concentration limits.

74.    The deficient underwriting, inadequate appraisal, excessive LTVs, insufficient collateral, lack of robust credit analysis and other deficiencies in the Cortland Loans were apparent from the loan packages provided to Defendants.  Defendants knew or should have known that the sources of repayment of the Cortland Loans were inadequate and vulnerable to the deteriorating housing market into which InBank was lending.  Thus, Defendants knew or should have known not to approve the Cortland Loans.

75.    Due to the actions and inactions of Defendants and their poor credit judgment relative to the Cortland Loans, InBank and FDIC-R incurred damages of at least $842,932.

**MBCA Loans**

76.     On May 24, 2006, the Loan Committee considered MBCA's request for a

$2,475,000 interest-only ADC loan.  The requested loan was designated a grade "B" credit risk.

The grade "B" rating meant the proposed credit was:

> very strong and well-structured.  The loan may not be as seasoned or as
> high quality as an A-rated credit, but it has sufficient credit strength so as
> not to represent a concern to management.

77.     The purpose of the requested loan was to fund the acquisition and development of

a townhome subdivision in Alsip, IL ("Alsip Property"), including infrastructure improvements,

and to fund an interest reserve.

78.     The loan presentation stated that the loan would have a twelve-month term and

would be personally guaranteed by Guarantor S, who had limited liquid assets despite a reported

net worth of $1.2 million and a two-year average income of $63,172.  These facts indicated that

Guarantor S was not creditworthy.

79.     Based on the $2,950,000 "as constructed" value of the Alsip Property stated in the

May 2006 loan presentation, the LTV of the requested loan was 84%, which violated Bank

policy and supervisory guidelines.  Based on other collateral, the LTV was approximately 76%.

80.     The loan was to be repaid from an interest reserve, then from unit sales.  Final

payment would not occur until the thirty-second of forty townhomes was sold.

81.     As the May 2006 loan presentation indicated, InBank had a 273% of Tier 1

Capital concentration in residential construction loans, which violated Bank policy.

82.     Notwithstanding the loan policy violations, Defendants Elmore, Reiher,

Browning, Romero and other members of the Loan Committee approved the above-described

loan ("MBCA Loan") on the day it was presented, conditioning their approval on a $220,000 pay down from each unit sold.

83.     On July 6, 2007, approximately one year after Defendants approved the MBCA Loan, MBCA requested an increase.  The purpose of the increase was to finish construction of the second building in the townhome complex, recharge the interest reserve and fund further infrastructure development.

84.     The July 2007 loan presentation stated that as of June 1, 2006, the "as completed" appraised value of the Alsip Property was $2,540,000, *i.e.*, $410,000 less than the "as constructed" appraised value stated just two months earlier in the May 24, 2006 loan presentation.

85.     The July 2007 loan presentation also stated that after the second building was constructed, the "as completed" LTV of the MBCA Loan would be 85%, which violated Bank policy.

86.     Per Guarantor S's June 11, 2007 personal financial statement, which was available to Defendants, Guarantor S had limited liquid assets and was highly leveraged.  Per Guarantor S's July 5, 2007 personal financial statement, which also was available to Defendants, Guarantor S's income significantly declined between 2004 and 2005, and he had elevated debt to income ratios of 90% and 140%, respectively.

87.     Despite the foregoing, the July 6, 2007 loan request designated the request a grade "B" credit risk.

88.     On July 6, 2007, Defendants Elmore, Reiher, Browning, Romero and other members of the Loan Committee approved an increase of $665,000, raising the principal balance of the MBCA loans to $3,140,000.

89.     Eventually, the loan became significantly past due, was put in nonaccrual and more than 57% of the original principal balance was charged off.

90.     Defendants' approval of the MBCA Loans violated InBank's loan policy and generally accepted standards of prudent lending in various respects including the following:

(i)     The loan's excessive LTVs violated Bank policy and supervisory guidelines;

(ii)    The LTVs were improperly calculated;

(iii)   Guarantor S's personal guaranty failed to provide material credit support;

(iv)    Repayment sources were speculative and inadequate;

(v)     There was inadequate support for the use of and subsequent increase in an interest reserve; and

(vi)    Defendants relied on inaccurate risk ratings that were not consistent with the Bank's loan policy.

91.     The deficient underwriting, inconsistent and inadequate information, loan policy violations, LTV calculation errors, excessive LTVs, insufficient collateral, lack of credit analysis, lack of a creditworthy guarantor and other deficiencies in the MBCA Loans were apparent from the loan packages provided to Defendants.  Defendants knew or should have known that the sources of repayment of the MBCA Loans were inadequate, speculative and vulnerable to the deteriorating housing market into which InBank was lending.  Thus, Defendants knew or should have known not to approve the MBCA Loans.

92.     Due to the actions and inactions of Defendants and their poor credit judgment relative to the MBCA Loans, InBank and FDIC-R incurred damages of at least $1,399,039.

**Loans to Borrower V**

93.     On November 8, 2006, Grazian presented to the Loan Committee Borrower V's request for a $3,565,000 interest-only ADC loan, the purpose of which was to fund acquisition and development of a single family home in Winnetka, IL ("Winnetka Property"), which Borrower V and her son would occupy.

94.     Grazian designated the requested loan a grade "A" credit risk.  The "A" grade was reportedly based on, among other things, the LTV.  However, the LTV was 100%, because InBank fully funded the acquisition and construction costs and also funded a $215,000 interest reserve.  The excessive LTV violated Bank policy and supervisory guidelines.

95.     The proposed loan would have a twelve-month term and would be personally guaranteed by Borrower V.  The loan was to be repaid through an interest reserve then Borrower V's income.  The November 2006 loan presentation reported that Borrower V's two-year average income was $97,736.  Although t reported that Borrower V's net worth exceeded $24 million, it did not report the amount of Borrower V's liquid assets.  The loan presentation also failed to report Borrower V's debt to income ratio or the current percentage of InBank's concentration in residential mortgages.  The information in the loan presentation was not sufficient for Defendants to properly assess Borrower V's repayment capacity or the propriety of the requested loan.

96.     Although one member of the Loan Committee voted against the above-described loan, Defendants Elmore, Reiher, Romero and other members of the Loan Committee approved the loan ("Borrower V Loan") on the day it was presented.

97.     There were cost overruns on the Winnetka project from the inception of construction, and construction costs continued to rise over time.

98.     Additionally, Borrower V's financial condition deteriorated.  As set forth in a personal financial statement Borrower V provided in May 2007, which was available to the Defendants, Borrower V was highly leveraged and had insubstantial liquid assets as compared to her liabilities.   Borrower V's cash flow for 2004 and 2005 was negative, her credit score declined over those years, and she had elevated personal debt service coverage ratios of 60% and 76%, respectively.  These facts indicated that Borrower V was not creditworthy

99.     Despite the deficiencies in the Borrower V Loan, on February 27, 2008, after the Loan matured, Defendants Elmore, Browning, Romero and other members of the Loan Committee approved a $500,000 increase in the Loan, raising the principal balance to $4,065,000.  The loan presentation stated that as of December 2006, the "as-completed" value of the Winnetka Property was $4,000,000, *i.e.*, $65,000 less than the increased principal balance of the Borrower V Loan.  Borrower V's son claimed that the requested increased would pay for construction of a pool and guest house, construction of which would increase the property's "as-completed" value to $5,500,000.

100.     The February 27, 2008 approval of the increased loan amount was subject to an updated appraisal establishing the predicted value of $5,500,000 and personal guarantees from both Borrower V and Borrower V's son.

101.     The Winnetka Property did not appraise for $5,500,000.  As of April 2008, the "as-completed" appraised value of the Winnetka Property was $5,000,000, *i.e.*, $500,000 less than the Loan Committee required on February 27, 2008.  This appraisal was available to Defendants.  Even though the conditions imposed by Defendants on the increased funding were not met, InBank officers nonetheless caused the increased loan amount to be funded.

102.     On July 9, 2008, five months after the February 2008 approval, Borrower V's son requested that InBank increase the Borrower V Loan by another $200,000, explaining that the loan was $323,716 out of balance.  Borrower V's son agreed to contribute the remaining $123,716.

103.     The July 2008 loan presentation stated that after the increase, the balance of the loan would be $4,515,000.  Based on the $4,065,000 principal balance stated in the prior request for increase, Defendants knew or should have known that an additional $250,000 had already been advanced.

104.     The July 2008 loan presentation stated that the LTV on the increased Borrower V Loan would be 73%.  However, based on the stated $4,515,000 principal balance of the Loan and the Winnetka Property's $5,000,000 appraised value, the LTV would be 90%, which violated Bank policy.

105.     Despite the foregoing inconsistencies and loan policy violations, Defendants Elmore, Reiher, Browning and Romero approved the July 9, 2008 loan request on the day it was presented.  When they approved the request, Defendants either knew that their prior conditions on the loan requests had not been satisfied or they failed to determine whether or not their conditions had been satisfied.

106.     Less than three months later, on October 1, 2008, the Bank considered a request for another $200,000 increase in the Borrower V Loan, which funds were needed to pay out of pocket construction expenses.  The borrower also requested approval of an end loan on the Winnetka Property.

107.     Ignoring the loan history, the failure of InBank officers to comply with prior conditions imposed by the Loan Committee, and the borrower's and guarantor's limited

repayment capacity, Defendants Elmore, Reiher and other members of the Loan Committee acted on the October 1, 2008 loan request by approving a loan in the amount of $4,521,589 and directing Borrower V's Loan to be converted into a principal and interest, three-year balloon loan.

108.     Following further loan modifications, the Bank began receiving notices of liens filed against the Winnetka Property.  The Borrower V Loan became significantly past due, went in to nonaccrual and a foreclosure action was filed.

109.     Defendants' approval of the Borrower V Loans violated InBank's loan policy and generally accepted standards of prudent lending in various respects including the following:

(i)      The Borrower V Loan had a 100% LTV loan, which violated Bank policy and supervisory guidelines;

(ii)     Defendants did not require Borrower V to make an equity contribution, which Bank policy required;

(iii)    The loan's LTVs were not correctly calculated;

(iv)     Loan terms were altered without, and subsequent to, Loan Committee approval (specifically, the interest rate was reduced, the loan term was extended, the loan fee was reduced and the due date for the fee was modified), and despite the Loan Committees' approval of subsequent advances,  the Loan Committee failed to take action on the alterations;

(v)      Defendants relied on inaccurate risk ratings that were not consistent with the Bank's loan policy;

(vi)     Defendants failed to adequately review and monitor the construction budget;

(vii)    Defendants relied on guarantees that provided no material credit support;

(viii)    Defendants funded interest reserves for non-creditworthy borrowers;

(ix)    Defendants failed to require adherence to existing loan terms and extended the

Borrower V Loan after it matured; and

(x)    Defendants granted multiple and excessively lengthy loan extensions.

110.    The deficient underwriting, inaccurate and inconsistent information, loan policy violations, excessive LTVs, inadequate appraisals, lack of proper credit analysis and other deficiencies in the Borrower V Loans were apparent from the loan packages provided to Defendants.  Defendants knew or should have known that the sources of repayment for the Borrower V Loans were inadequate, speculative and vulnerable to the deteriorating housing market into which InBank was lending.  Thus, Defendants knew or should have known not to approve the Borrower V Loans.

111.    Due to the actions and inactions of Defendants and their poor credit judgment relative to the Borrower V Loans, InBank and FDIC-R incurred damages of at least $804,481.

**Loans to Borrower A**

112.    On September 5, 2007, Grazian presented to the Loan Committee Borrower A's request for a $1,380,000 interest-only construction loan, designating the requested loan a grade "B" credit risk.

113.    The purpose of the Loan was to fund the acquisition and construction of a single family residence located on Hoyne Street, Chicago, IL ("Hoyne Property").  It also funded an interest reserve.

114.    The proposed loan would have a twelve-month term and would be personally guaranteed by Borrower A.  Borrower A's August 2007 personal financial statement, which was

made available to Defendants, showed Borrower A was highly leveraged and his debt to income ratios for 2005 and 2006 were 46% and 48%, respectively.

115.    The loan would be repaid through an interest reserve and then Borrower A's personal income.

116.    When the proposed loan was presented to the Loan Committee, Defendants Elmore, Reiher, Browning, Romero and other members of the Loan Committee approved a loan in the amount of $1,200,000 ("Borrower A Loan").

117.    Defendants' approval of the Borrower A Loan was conditioned on the "as completed" value of the Hoyne Property being at least $1,800,000, *i.e.*, the price at which Borrower A planned to sell the Hoyne Property.

118.    The September 24, 2007 appraisal InBank received assigned the Hoyne Property an "as completed" value of $1,420,000, *i.e.*, $380,000 less than the value required by the Loan Committee.  InBank nonetheless funded the loan, as Grazian told Romero and the loan administrator who flagged the $380,000 shortfall to "Close it or else . . . . ."

119.    Based on the $1,420,000 appraised value of the Hoyne Property, the LTV of the Borrower A Loan was 85%, which violated Bank policy and supervisory guidelines.

120.    On March 27, 2008, six months after the Loan Committee approved the Borrower A Loan, Grazian presented Borrower A's request for a $227,000 increase in the loan, which would raise the loan's principal balance to $1,427,000 ($7,000 more than the "as completed" value of the Hoyne Property).  The purpose of the requested increase was to enable Borrower A to complete the Hoyne project.

121.    Defendants Elmore, Reiher, Browning and other members of the Loan Committee knew the appraised value of the Hoyne Property was less than they required in September 2007

(as the appraised value was stated in the March 2008 presentation), knew Grazian had violated the conditions they imposed on the loan, and knew of other deficiencies in the Borrower A Loan. Nonetheless, they approved the March 2008 request to increase the Borrower A Loan.

122.     The Bank's files include a November 14, 2008 contract to purchase the Hoyne Property for $1,075,000, which purchase transaction never closed.  On June 3, 2009 the Borrower A Loan was put into nonaccrual.

123.     Defendants' approval of the Borrower A Loans violated InBank's loan policy and generally accepted standards of prudent lending in various respects including the following:

(i)     The LTVs on the Borrower A Loans were excessive, violating both Bank policy and supervisory guidelines;

(ii)     Calculating the LTV based on the Hoyne Property's "as completed" value violated the Bank's loan policy and supervisory guidelines;

(iii)     Borrower A's financials showed he was highly leveraged, had insubstantial liquid assets and had elevated debt to income ratios, rendering him non-creditworthy and an inadequate and speculative repayment source;

(iv)     Defendants funded an interest reserve despite knowing of Borrower A's insubstantial financial wherewithal or without doing anything to determine Borrower A's wherewithal; and

(v)     Defendants increased the Borrower A Loan despite the shortfall in the appraised value of the Hoyne Property.

124.     The deficient underwriting, inadequate collateral, excessive LTVs, loan policy violations, violations of Loan Committee directives, lack of proper credit analysis and verifications, failure to properly analyze Borrower A's creditworthiness and other deficiencies in

the Borrowers A Loans were apparent from the loan packages provided to Defendants. Defendants knew or should have known that the sources of repayment of the Borrower A Loans were inadequate, speculative and vulnerable to the deteriorating housing market into which InBank was lending. Thus, Defendants knew or should have known not to approve the Borrower A Loans.

125.    Due to the actions and inactions of Defendants and their poor credit judgment relative to the Borrower A Loans, InBank and FDIC-R incurred damages of at least $553,000.

**ICON Loan**

126.    In June 2007, Grazian presented to the Loan Committee ICON's request for a $6,000,000 construction line of credit to build a mixed-use building on Division Street, Chicago, IL ("Division Property"). Although Defendants Elmore, Browning, Reiher, Romero and other members of the Loan Committee approved the loan, their approval was subject to a participation sufficient to avoid a lending limit violation.

127.    While InBank was looking for a participant, another lender closed the transaction for ICON. ICON subsequently became dissatisfied with the other lender. Accordingly, on April 9, 2008, Grazian presented to the Loan Committee a request for a $5,500,000 interest-only loan sufficient for ICON to refinance the ADC loan originated by the other lender ($1,900,000), fund construction of the Division Street project ($3,325,000) and fund an interest reserve. The loan request was subject to a $1,500,000 participation to avoid a lending limit violation.

128.    In view of the funding requirements stated in the April 2009 presentation, Defendants knew the $4,000,000 InBank could fund would not be sufficient for ICON to complete the Division Street project.

129.    Per the April 2009 presentation, the requested loan would have a twelve-month term and would be personally guaranteed by Guarantor JK, Guarantor JA, and Guarantors PCS. Borrower V and her son (both of whom were involved in the above-described Borrower V Loans) may also have been intended guarantors.  Grazian designated the requested loan a "B" grade credit risk.

130.    Based on 2007 personal financial statements available to Defendants, Guarantor JK, Guarantor JA and Borrower V were highly leveraged and had insubstantial liquid assets as compared to their liabilities.  Additionally, Borrower V had a negative cash flow for 2004 and 2005, her credit score declined over those years and she had elevated personal debt service coverage ratios of 60% and 76%, respectively.  Guarantors PCS did not have sufficient liquid assets or net worth to repay the requested loan.

131.    Based on the guarantors' financials, Defendants knew or should have known that if the Bank did not secure a participant, the guarantors would not be able to fund completion of the Division Street project.

132.    As stated in Grazian's  initial loan presentation, as of March 31, 2007, InBank had a 211% of Tier 1 Capital concentration in residential construction mortgages.  Its loan concentration in Chicago was 345% of Tier 1 Capital.

133.    Defendants Elmore, Browning, Reiher, Romero and other members of the Loan Committee approved the $5,500,000 ICON Loan ("ICON Loan") on April 9, 2008, the same day it was presented.

134.    After Defendants approved the ICON Loan, but before it closed, Grazian changed the loan term to sixteen months and agreed that InBank would fund an amount sufficient to pay off the acquisition loan from the other lender before securing a participant.

135.    InBank funded the ICON Loan, but never secured a participation.

136.    Defendant's approval of the ICON Loan violated InBank's loan policy and generally accepted standards of prudent lending in various respects including the following:

(i)      The identified sources of repayment were speculative and inadequate;

(ii)     The creditworthiness of the guarantors was not accurately or thoroughly assessed;

(iii)    Defendants approved the ICON Loan even though they knew the Bank had already exceeded the concentration limits in its loan policy; and

(iv)     Defendants approved the ICON Loan even though they knew the real estate market into which the Bank was lending had precipitously declined.

137.    The deficient underwriting, loan policy violations, lack of credit analysis, speculative and inadequate sources of repayment and other deficiencies in the ICON Loan were apparent from the loan packages provided to Defendants.  Thus, Defendants knew or should have known not to approve the ICON Loan.

138.    Due to the actions and inactions of Defendants and their poor credit judgment relative to the ICON Loan, InBank and FDIC-R incurred damages of at least $788,692.

## V.    CLAIMS FOR RELIEF

### COUNT I

### NEGLIGENCE – ILLINOIS LAW
### [IN THE ALTERNATIVE TO COUNT III]

139.    FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-138 above as if fully set out in this Paragraph 139.

140.    As members of the Loan Committee and Directors and/or Officers of InBank, Defendants Elmore, Browning, Reiher and Romero were required to conduct the Bank's

business consistent with prudent, safe and sound lending practices.  More specifically, they owed the Bank duties including, but not limited to, the following:

A. Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

B. Approving only those loans that conformed to the Bank's lending policies;

C. Approving only those loans that conformed to prudent, safe and sound lending practices;

D. Ensuring that loans they approved were soundly underwritten;

E. Ensuring that loans they approved were secured by collateral and guarantees of sufficient value to prevent or minimize the risk of loss to the Bank; and

F. Ensuring that loans were administered in accordance with approved loan terms.

141. Defendants breached their duties by voting to approve one or more of the CRE and ADC loans identified in above Paragraphs 39-138, because they knew, or should have known:

A. The loans were not properly underwritten and/or were inconsistent with prudent lending practices;

B. The loans, and the projects underlying the loans, were not properly monitored, and the loans did not comply with approved loan terms;

C. The Chicago-area CRE and ADC market, where the collateral securing the loans was located, was in decline;

D. InBank was already over-exposed to CRE and ADC risk and had insufficient loan loss reserves to cushion against that risk; and/or;

E.     Each of the loans involved one or more of the following characteristics, which increased the risks of default:

(1)  Violations of the Bank's loan policy;

(2)  A borrower or guarantor (or both) with limited liquid assets, excessive liabilities, or otherwise lacking the financial wherewithal to service their loan;

(3)  Insufficient collateral protection;

(4)  Inadequate and/or speculative sources of repayment; and

(5)  Reliance on interest reserves, which masked problems with the credits.

F.     Grazian and other InBank loan officers had a pattern of unilaterally changing loan terms and disregarding conditions imposed by the Loan Committee.

142.   As a direct and proximate result of Defendants' negligence and failure to conduct the Bank's business consistent with prudent, safe and sound lending practices, FDIC-R suffered damages in excess of $6.8 million, which damages will be more particularly determined at trial.

## COUNT II

## GROSS NEGLIGENCE – VIOLATION OF 12 U.S.C. §1821(k)

143.   FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-138 above as if fully set out in this Paragraph 143.

144.   Pursuant to Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), and without impairing or affecting any right of the FDIC under any other law, directors and officers of financial institutions are personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law.

145.     Defendants Elmore and Browning were Officers and Directors of the Bank. Defendant Reiher was a Director of InBank. Defendant Romero was an Officer of the Bank.

146.     Under Illinois law, gross negligence means "very great negligence" but something less than willful, wanton and reckless conduct.

147.     As members of the Loan Committee and as Directors and/or Officers of InBank, Defendants Elmore, Browning, Reiher and Romero were required to conduct the Bank's business consistent with prudent, safe and sound lending practices.  More specifically, they owed the Bank duties including, but not limited to, the following:

A.     Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

B.     Approving only those loans that conformed to the Bank's lending policies;

C.     Approving only those loans that conformed to prudent, safe and sound lending practices;

D.     Ensuring that loans they approved were soundly underwritten;

E.     Ensuring that loans they approved were secured by collateral and guarantees of sufficient value to prevent or minimize the risk of loss to the Bank; and

F.     Ensuring that loans were administered in accordance with approved loan terms.

148.     Defendants breached their duties by voting to approve one or more of the CRE and ADC loans identified in above Paragraphs 39-138, because they knew, or should have known:

A.     The loans were not properly underwritten and/or were inconsistent with prudent lending practices;

B.　　The loans, and the projects underlying the loans, were not properly monitored, and the loans did not comply with approved loan terms;

C.　　The Chicago-area CRE and ADC market, where the collateral securing the loans was located, was in decline;

D.　　InBank was already over-exposed to CRE and ADC risk and had insufficient loan loss reserves to cushion against that risk; and/or;

E.　　Each of the loans involved one or more of the following characteristics, which increased the risks of default:

　　　(1) Violations of the Bank's loan policy;

　　　(2) A borrower or guarantor (or both) with limited liquid assets, excessive liabilities, or otherwise lacking the financial wherewithal to service their loan;

　　　(3) Insufficient collateral protection;

　　　(4) Inadequate and/or speculative sources of repayment; and

　　　(5) Reliance on interest reserves, which masked problems with the credits.

F.　　Grazian and other InBank loan officers had a pattern of unilaterally changing loan terms and disregarding conditions imposed by the Loan Committee.

149.　　As a direct and proximate result of Defendants' gross negligence and failure to conduct the Bank's business consistent with prudent, safe and sound lending practices, FDIC-R suffered damages in excess of $6.8 million, which damages will be more particularly determined at trial.

## COUNT III

### BREACH OF FIDUCIARY DUTY – ILLINOIS LAW
### [IN THE ALTERNATIVE TO COUNT I]

150.     FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-138 above as if fully set out in this Paragraph 150.

151.     Defendant Romero, as a member of the Loan Committee and an Officer of the Bank, owed the Bank fiduciary duties to act with the utmost care and in the best interests of the Bank.  These duties included, but were not limited to, the following:

A.     Informing himself about proposed loans and the risks the loans posed to the Bank before approving them;

B.     Approving only those loans that conformed to the Bank's lending policies;

C.     Approving only those loans that conformed to prudent safe and sound lending practices;

D.     Ensuring that loans they approved were soundly underwritten;

E.     Ensuring that loans they approved were secured by collateral and guarantees of sufficient value to prevent or minimize the risk of loss to the Bank; and

F.     Ensuring that loans were administered in accordance with approved loan terms.

152.     Defendant Romero breached his fiduciary duties by voting to approve one or more of the CRE and ADC loans identified in above Paragraphs 39-138, because he knew, or should have known:

A.     The loans were not properly underwritten and/or were inconsistent with prudent lending practices;

B.      The loans, and the projects underlying the loans, were not properly monitored, and the loans did not comply with approved loan terms;

C.      The Chicago-area CRE and ADC market, where the collateral securing the loans was located, was in decline;

D.      InBank was already over-exposed to CRE and ADC risk and had insufficient loan loss reserves to cushion against that risk; and/or;

E.      Each of the loans involved one or more of the following characteristics, which increased the risks of default:

(1) Violations of the Bank's loan policy;

(2) A borrower or guarantor (or both) with limited liquid assets, excessive liabilities, or otherwise lacking the financial wherewithal to service their loan;

(3) Insufficient collateral protection;

(4) Inadequate and/or speculative sources of repayment; and

(5) Reliance on interest reserves, which masked problems with the credits.

F.      Grazian and other InBank loan officers had a pattern of unilaterally changing loan terms and disregarding conditions imposed by the Loan Committee

153.    As a direct and proximate result of Defendant Romero's breach of his fiduciary duties and failure to conduct the Bank's business consistent with prudent, safe and sound lending practices, FDIC-R suffered damages in excess of $6.8 million, which damages will be more particularly determined at trial.

WHEREFORE, the Federal Deposit Insurance Corporation as Receiver for InBank demands a trial by jury and judgment in its favor and against the Defendants, setting forth:

    A.      The amount of damages caused by each Defendant;

    B.      The amount of accrued interest (including pre-judgment interest) on such damages;

    C.      An award in favor of FDIC-R for the full amount thereof;

    D.      An award in favor of FDIC-R for its costs and other expenses incurred in connection with this proceeding; and

    E.      Such other and further relief in favor of FDIC-R as this Court deems just and proper.

Dated: March 7, 2013                Respectfully submitted,

                                      Federal Deposit Insurance Corporation
                                      as Receiver for InBank

                                    By: /s/  Stephen H. Pugh
                                        One of Its Attorneys

Stephen H. Pugh (ARDC #2262177)
Kathleen R. Pasulka-Brown (ARDC #6194317)
Rachel Steiner (ARDC #6284064)
Pugh, Jones & Johnson, P.C.
180 North LaSalle Street, Suite 3400
Chicago, Illinois 60601
Telephone: (312) 768-7800
Facsimile: (312) 768-7801
Spugh@pjjlaw.com
Kpasulka-brown@pjjlaw.com
Rsteiner@pjjlaw.com